## LIMBACH COMPANY

v.

## SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL–CIO and Sheet Metal Workers International Association, Local Union No. 108, Appellants.

No. 90–3606.

United States Court of Appeals,
Third Circuit.

Argued April 9, 1991.

Reargued Oct. 9, 1991.

Decided Dec. 6, 1991.

Robert A. King (argued), P. Jerome Richey, Buchanan Ingersoll, Professional Corp., Pittsburgh, Pa., for Limbach Co.

Donald W. Fisher, Toledo, Ohio, Judith Rivlin, Washington, D.C., for Sheet Metal Workers Intern. Ass'n, AFL–CIO.

Michael Shelley, Wohlner, Kaplan, Phillips, Vogel, Shelley & Young, Encino, Cal., for Sheet Metal Workers Intern. Ass'n, Local Union No. 108.

Marsha S. Berzon, Laurence Gold (argued), Washington, D.C., of counsel with Sheet Metal Workers Intern. Ass'n and Local Union No. 108.

Argued April 9, 1991.

Before SLOVITER, Chief Judge, and GREENBERG and WISDOM,* Circuit Judges.

Reargued October 9, 1991

Before SLOVITER, Chief Judge, and BECKER, STAPLETON, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, and ROTH, Circuit Judges.

OPINION OF THE COURT
GREENBERG, Circuit Judge.

## I.

## BACKGROUND

This matter is before the court in banc pursuant to our order of August 21, 1991, granting partial rehearing to Sheet Metal Workers International Association, AFL–CIO and Sheet Workers International Association Local Union No. 108 in No. 90–3606. By our opinion of July 9, 1991, a panel of this court disposed of the appeals of these two labor organizations as well as the appeal of Limbach Company (Limbach) in No. 90–3639, 949 F.2d 1211 (3rd Cir.1991). While our prior opinion was partially in favor of these two labor organizations and was wholly in favor of three other local unions and thus to that extent was against Limbach, it has not cross-petitioned for rehearing. Thus, we are concerned only with the issues raised in the petition filed by the

International and Local 108 which we will hereafter in certain contexts sometimes refer to as the unions to the exclusion of the other locals.

While the background on the case is set forth in the panel's opinion, for purposes of completeness we will repeat it. Limbach is a mechanical contracting company with offices in Pittsburgh, Pennsylvania, Woburn, Massachusetts (Boston), Compton, California (Los Angeles), Pontiac, Michigan (Detroit), and Columbus, Ohio. Prior to the events underlying this case, Limbach was a union contractor and was a member of multi-employer bargaining associations in the metropolitan areas where it operated. Through its membership in these bargaining organizations, Limbach had collective bargaining relationships with the sheet metal workers' union—Local No. 12 in Pittsburgh, Local No. 17 in Boston, Local No. 80 in Detroit, Local No. 98 in Columbus, and Local No. 108 in Los Angeles.

In 1982–83, Limbach was reorganized and became a wholly-owned subsidiary of Limbach Constructors, Inc. and, as part of this reorganization, Jovis Constructors, Inc. was formed as a sister-company to Limbach. A purpose of the reorganization and the formation of Jovis was so that the Limbach organization could acquire nonunion operations in new geographic areas. Thus, in July 1983, Jovis purchased Harper Plumbing & Heating Company, Inc. in Florida. Harper had been a nonunion contractor for 30 years and, following its acquisition by Jovis, continued to be nonunion.

When Edward Carlough, the General President of the International Union, learned of this acquisition, he wrote a letter dated August 10, 1983, to Walter Limbach, the president of Limbach until 1983, and the president of Limbach Constructors, Inc. from 1983 to 1988, stating:

I want to congratulate you on your company's takeover of Harper Plumbing and Heating in Orlando, Florida. We have been attempting to organize this contractor for a good number of years, and it was very thoughtful of you to have us

---

* Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

organize this firm through your purchase of it.

App. at 2737.

The letter suggested a meeting between Lonnie Bassett, the International's Director of Organization, or Larry Cassidy, Carlough's assistant, to "consummate a labor agreement with your new shop." Walter Limbach gave this letter to Charles Prey, his successor as President of Limbach, who wrote to Carlough informing him that Limbach had not acquired Harper.

In October 1983, Cassidy and Walter Limbach met at Limbach's Pittsburgh office. Cassidy told Walter Limbach that Carlough expected Limbach to have Harper sign a collective bargaining agreement with a union affiliate and stated that the Harper nonunion operation violated existing collective bargaining agreements between Limbach and Locals 12, 17, 80, 98 and 108.

Walter Limbach disagreed with Cassidy, maintaining that Jovis, not Limbach, had acquired Harper, that Harper was a separate employer from Limbach and that Limbach had no authority over Harper's labor relations matters. Cassidy told Walter Limbach that if Harper did not sign a labor agreement, contract violation grievances would be filed and if they did not result in Harper's unionizing, Limbach would face serious labor problems.

Carlough, Cassidy and Walter Limbach met on November 23, 1983, to discuss the Harper situation. Carlough asserted that Limbach was in violation of its local collective bargaining agreements by virtue of the Harper operation and he told Walter Limbach that the Union would file grievances alleging these violations. Walter Limbach maintained his position that Limbach and Harper were separate and that Limbach had no authority to sign a collective bargaining agreement on behalf of Harper. Carlough told Walter Limbach that if the situation were not resolved, the locals would disclaim interest in representing Limbach employees upon the expiration of their existing collective bargaining agreements.

The local unions filed grievances in the summer of 1984, alleging that Limbach was in violation of its collective bargaining agreements with them by virtue of its sister-relationship with Harper. The grievances of Locals 12, 17 and 108 ultimately came before the National Joint Adjustment Board for the Sheet Metal Industry, the final decision maker under the collective bargaining agreements. This board was composed of an equal number of union and employer representatives.

The unions' grievances alleged that the operation of Harper on a nonunion basis was a breach of the Standard Form of Union Agreement, negotiated by the International Union and the Sheet Metal and Air Conditioning Contractors National Association which represented Limbach. The agreement serves as a model for local collective bargaining agreements. It was the unions' belief that the Standard Form of Union Agreement prohibited "double-breasting," meaning that a company owns both union and nonunion shops. Carlough believed he could force Harper to recognize the union through the grievance process by claiming that Limbach was in violation of its agreements through its affiliation with Harper. On February 8, 1985, the National Joint Adjustment Board issued its decision on the grievances but was deadlocked on whether Limbach had violated any of the provisions of its bargaining agreements. It did, however, find that the agreement between Limbach and Local 17 was not valid and binding and was of no force or effect.

Faced with the failure of the grievances against Limbach, Carlough met with the International Union's General Executive Council to develop an alternate method to combat double-breasting and this led to the development of the so-called "Integrity Clause."[1] The Integrity Clause obligated an employer to notify the union if it became affiliated through common ownership with a nonunion shop and gave local unions the power to rescind their labor agree-

1. The details of the integrity clause are set forth in the panel's decision but are not important for our decision here.

ments upon an employer's becoming so affiliated. In a letter dated March 22, 1985, Carlough instructed the local unions to have the Integrity Clause negotiated into their local agreements as soon as possible. Furthermore Carlough met on April 15, 1985, with the Executive Committee of the Sheet Metal and Air Conditioning Contractors National Association in Washington to discuss the Integrity Clause. At the same time, the International attempted to dissuade union members from working for double-breasting contractors, including Limbach, doing this with written appeals promoting union loyalty and changes in withdrawal card rights and pension benefits for members who continued working for companies affiliated with nonunion operations.

In the spring and summer of 1986, Locals 12, 17 and 108 did not renew the collective bargaining agreements as they expired and the locals issued disclaimers terminating their representation of Limbach employees.[2] Local 98 disclaimed the following year when its agreement expired. By June 1988, Limbach's operations were 100% nonunion.

In the summer of 1986, Carlough spoke at the convention of Sheet Metal Workers International Association. He said, in part:
... Take this message back to Limbach. We are not in the business of getting rid of union contractors. We are in the business of organizing contractors.

\* \* \* \* \* \*

Limbach used to be with [the Sheet Metal and Air Conditioning Contractors National Association] years ago. You ought to understand the union thinking in the union man's mind. *To me it's never too late. The door in this union is open.*
*If the man wants to come back and operate the right way* I know both our people, both in Los Angeles and in Pittsburgh, and Walsh and the gang in Boston, if the man wants to straighten out the situation, who knows. He is a very smart fellow.
He wants to straighten the situation out. *He will find out he is welcome back in this family. We want them union ....*
App. at 2858 (emphasis added).

## II.

## PROCEDURAL HISTORY AND THE PANEL OPINION

On June 17, 1986, Limbach filed its complaint in the district court against the International Union, and Locals 12, 17 and 108, and on January 12, 1988, it filed an amended complaint joining Local 98 as a defendant. The complaint asserted unfair labor practice claims under section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, which allows a damages action for violations of the secondary boycott provisions of section 8(b)(4) of the National Labor Relations Act, (NLRA), 29 U.S.C. § 158(b)(4). In addition, Limbach asserted antitrust claims under section 4 of the Clayton Act, 15 U.S.C. § 15.[3]

The case was bifurcated for trial between the liability and damages issues with the initial phase involving liability. At this phase, the jury was instructed on alternate theories of liability on the unfair labor practices claims. Thus, it was told that it could find an unfair labor practice based either on the unions' inducing Limbach employees to refuse to perform services in the course of their employment or on the unions' coercion of Limbach, by disclaiming representation of Limbach with the objective to force Harper to negotiate with the union or to have Limbach disassociate itself from Harper. On June 29, 1990, the jury returned three special verdicts on the liability issues under section 303. In Special Verdict No. 1 the jury found that Limbach and Harper were separate employers within the meaning of the NLRA, 29 U.S.C. § 151 *et seq.* In Special Verdict No. 2 the

---

**2.** Earlier, on April 18, 1986, Local 17 declared its agreement with Limbach to be void and disclaimed interest in representing Limbach employees in Boston but it was subsequently forced to resume its relationship with Limbach pursuant to court order.

**3.** The complaint also made other claims which were described in the panel opinion but are not involved here.

jury found that the International Union and each of the four affiliated local unions had committed an unfair labor practice under section 303. However, Special Verdict No. 2 did not reveal whether the jury's finding of an unfair labor practice was based on the unions' inducing Limbach employees to refuse to work, or whether it was based on the unions' coercion of Limbach. Special Verdict No. 3 asked:

> Was the violation of Section 303 of the Labor Management Relations Act committed by any of the union defendants listed below a substantial factor in bringing about harm to plaintiff's business or property?

In response the jury answered "yes" as to the International Union and Local 108 (Los Angeles) but "no" as to Locals 12, 17 and 98. The antitrust claim was not submitted to the jury as, on July 3, 1990, the district court granted the unions' motion for a directed verdict on that claim.

On July 9, 1990, the district court, in the light of Special Verdict No. 3, ruled that Limbach could present evidence of damages on the secondary boycott claim as to its Los Angeles operation but not as to those in Pittsburgh, Boston, and Columbus. On July 13, 1990, after the trial was resumed and additional testimony presented, the jury returned a special verdict on damages awarding Limbach $2,823,000 against the International Union and Local 108 on the secondary boycott claim. The district court thus entered judgment in favor of Limbach and against the International Union and Local 108 for $2,823,000, but it also entered judgment in favor of Locals 12, 17 and 98, against Limbach. On August 3, 1990, the court denied motions of Limbach, the International and Local 108 for judgments notwithstanding the verdict and, in addition, it denied a motion by Limbach for a new trial. The International Union, Local 108, and Limbach filed timely appeals invoking our jurisdiction under 28 U.S.C. § 1291.

In our panel determination we held that the district court's order entering judgment against the International and Local 108 could not stand, as the verdict may have been predicated on an impermissible basis. We reached this conclusion because while the unions may have induced the employees to quit their employment, we concluded that this would not be a refusal to work in the course of employment within section 8(b)(4)(i) of the NLRA, and the verdict may have been predicated on this basis. This ruling is not before this in banc court as Limbach has not petitioned for rehearing. We held, however, by a divided vote that the unions may have been appropriately held liable under section 8(b)(4)(ii) of the secondary boycott provisions of the NLRA and thus we reversed and remanded for a new trial under that section. We affirmed the district court's order entering judgment in favor of Locals 12, 17 and 98 on the secondary boycott claims, because we found that the jury's determination that Limbach suffered no damages in the applicable areas could not be disturbed under the appropriate standard of review and this determination is not presently before us. Finally, we affirmed the district court's grant of the directed verdict against Limbach on its antitrust claim against the unions because we found that there was insufficient evidence in the record to support Limbach's claim of a conspiracy, a ruling which also is not before us. We directed that on remand the issue of whether Limbach and Harper are separate employers would not be retried.

### III.

### APPEAL OF THE INTERNATIONAL UNION AND LOCAL 108

Subsequently, the International Union and Local 108 petitioned for rehearing in No. 90–3606 and by our order of August 26, 1991, we granted rehearing in banc and vacated the panel opinion solely as it pertains to these unions' appeals. Thus, as Limbach has not petitioned for rehearing in banc, we now focus only on the alleged violation of the secondary boycott provisions of the NLRA recognized as viable by the panel. The unions challenge the panel's opinion and argue that, as a matter of law, they cannot be liable for a secondary boycott violation for the disclaimer of the

bargaining agreements with Limbach upon their natural expiration, regardless of their motives for the disclaimer. Accordingly, they contend that, as the verdict could have rested only on that disclaimer, or on their alleged conduct in inducing the employees to quit their employment, which the panel determined was not actionable, rather than remanding for a new trial we should remand for entry of a judgment in their favor. The unions also contend that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict on the secondary boycott violations as they contend that, notwithstanding the verdict, Limbach and Harper are not separate employers within the meaning of the secondary boycott provisions of the NLRA. Of course, if they were not separate employers, there could be no secondary boycott.

We agree with the opinion of the panel. Thus, we hold that the disclaimer scheme could be the basis for the finding of a secondary boycott violation under section 8(b)(4)(ii) and further hold that the district court did not err in denying the unions' motions for a directed verdict and judgment notwithstanding the verdict which the unions grounded on the contention that Limbach and Harper are not separate employers within the secondary boycott provisions of the NLRA. Rather, we find that the jury's conclusion in Special Verdict No. 1, that Limbach and Harper are separate employers, is supported in the record and is justified by our established law and, therefore, we hold that the district court correctly denied the unions' motions grounded on this argument. Pursuant to *Childers v. Joseph*, 842 F.2d 689, 699 (3d Cir.1988), we find that the separate employer issue is distinct and separate and need not be an issue for the jury on the retrial. *See also* 6A Moore's Federal Practice ¶ 59.06 (2d

ed.1989). We find that there will be no injustice if the jury is informed that, for purposes of its determination of whether the unions violated section 8(b)(4)(ii), Limbach and Harper are separate employers. Accordingly, we will reinstate the panel opinion and will remand this case to the district court for a trial on the issue of whether the union's actions violated the secondary boycott provisions of section 8(b)(4)(ii).

## IV.

## STATUTORY FRAMEWORK

a. *Section 8(f) Agreements in the Construction Industry*

An understanding of this case requires a description of some basic labor law principles. In general, under the NLRA an employer and a union can engage in collective bargaining only if a majority of the employees in the bargaining unit choose the union. *See* 29 U.S.C. § 159. However, section 8(f) of the NLRA contains an exception to this rule applicable to the construction industry which permits employers and unions to enter into voluntary section 8(f) collective bargaining agreements, commonly called "prehire agreements," without regard for the union's majority status.[4] 29 U.S.C. § 158(f). A pre-hire agreement is a contract between an employer and a union before the workers to be covered by the contract have been hired. *See International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 773 (3d Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). Under section 8(f), employers and unions in the construction industry are permitted to enter into pre-hire agreements, designating the union as the exclusive representative of a company's

---

**4.** Section 8(f) of the NLRA, 29 U.S.C. § 158(f), provides in part:

[i]t shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged ... in the building and construction industry with a labor organization of which building and con-

struction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) *the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement ....*
(emphasis added).

employees without testing the unions' majority status. *Iron Workers,* 843 F.2d at 773. Since Limbach is involved in the construction industry, its agreements with the local unions were section 8(f) agreements.[5]

b. *Secondary Boycott Restrictions*

Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, creates a cause of action for damages for violations of section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).[6] Section 8(b)(4) of the NLRA provides, in part:

> [i]t shall be an unfair labor practice for a labor organization or its agents—
>
> (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, material, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
>
> (A) *forcing or requiring any employer* or self-employed person *to join any labor or employer organization* or to enter into any agreement which is prohibited by subsection (e) of this section;
>
> (B) *forcing or requiring* any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or *to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative*

*of such employees* under the provisions of section 159 of this title....

(emphasis added).

Limbach's theory in its section 8(b)(4) claim against the unions was that the unions' actions in encouraging Limbach employees to quit and in disclaiming their section 8(f) agreements with Limbach constituted coercion in violation of the secondary boycott provisions of section 8(b)(4)(i–ii), causing Limbach economic damages. According to Limbach, the unions' actions were intended to coerce Harper into bargaining with a non-certified union or, alternatively, to force Limbach, Limbach Constructors, Inc., Jovis and Harper to disassociate from each other. Of course, as an in banc court we are only concerned with the disclaimer aspect of this claim.[7]

Section 8(b)(4)(ii) of the NLRA prohibiting secondary boycotts by unions essentially prohibits union conduct designed to force a primary employer (the employer with which the union has a dispute) to bargain with a union or to force a neutral employer (an employer with which the union has no dispute) to cease doing business with the primary employer. The proscribed methods used to achieve the objectives include threatening, coercing, or restraining the secondary employer. *See, e.g., Soft Drink Workers Union Local 812 v. NLRB,* 657 F.2d 1252 (D.C.Cir.1980). Coercion can include economic pressure upon the neutral party. *Allentown Racquetball & Health Club, Inc. v. Building and Constr. Trades Council of Lehigh and Northampton Counties,* 525 F.Supp. 156 (E.D.Pa.1981). The purpose of the prohibition against secondary boycotts is to shield unoffending employers from pressures in disputes not their own, though preserving the rights of unions to bring pressure to bear on offending employers in

---

**5.** Of course, a union can also become the representative in the first instance through a National Labor Relations Board election or voluntary recognition under section 9(a), 29 U.S.C. § 159(a).

**6.** 29 U.S.C. § 187 provides in part:
(a) [i]t shall be unlawful, for the purpose of this section only, in an industry or activity

affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

**7.** At oral argument before the in banc court Limbach made it clear that it made a considered decision not to petition for rehearing insofar as the panel rejected its section 8(b)(4)(i) claim.

primary labor disputes. *Anderson v. International Bhd. of Elec. Workers, Local No. 712, AFL–CIO,* 422 F.Supp. 1379 (W.D.Pa.1976).

## V.

### SECONDARY BOYCOTT

■ The unions assert that, as a matter of law, they cannot be liable for a secondary boycott violation under section 8(b)(4)(ii) because they merely repudiated their section 8(f) agreements upon their natural expiration. They therefore urge that they are entitled to judgment in their favor without a retrial as the panel ruled in their favor on the section 8(b)(4)(i) claim. According to the unions, the lawfulness of a repudiation of a section 8(f) agreement upon its expiration is not dependent on the motive of the repudiating party.[8] We are, however, not persuaded by the unions' argument on this issue. Rather, we hold that the unions' actions in disclaiming their section 8(f) agreements could be the basis of a secondary boycott violation under section 8(b)(4)(ii). The unions rely on the decision in *John Deklewa & Sons,* 282 N.L.R.B. 1375 (1987), *enf'd sub nom., International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 3 v. NLRB,* 843 F.2d 770 (3d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988), in support of their argument that they were free, as a matter of law, to disclaim their section 8(f) agreements with Limbach upon their natural expiration. Consequently, in their view, it follows that any proscribed secondary motive is irrelevant.

In *Deklewa,* the Board considered: (1) whether a section 8(f) agreement is unilaterally revocable during its term or is as binding during that term as any other union agreement and (2) whether, pursuant to section 8(a)(5), a section 8(f) agreement requires an employer to bargain with a union as the employees' exclusive representative *after* the expiration of the section 8(f) agreement. 282 N.L.R.B. at 1375.

The Board held that section 8(f) agreements are not unilaterally voidable, overturning its earlier ruling which held section 8(f) agreements voidable at will. *Id.* at 1377. The Board also held that upon the agreement's expiration, the union would not enjoy a presumption of majority status, as under a section 9(a) agreement, and that the employer's obligation to bargain with the union, based on a section 8(f) agreement, expired with that agreement. *Id.* The union was proscribed from using coercive measures, including strikes and picketing, to compel negotiation and/or adoption of a successor agreement. *Id.* at 1386. This court upheld the Board's ruling as a reasonable interpretation of the NLRA. *Iron Workers,* 843 F.2d at 779–80.

The unions also rely on *Yellowstone Plumbing, Inc.,* 286 N.L.R.B. 993 (1987). In *Yellowstone,* during a period in which a section 8(f) agreement was in effect between a plumbing contractor and a union, the employer unlawfully encouraged an effort to have the union decertified but had not succeeded by the time the contract expired. Once the contract expired, the employer withdrew recognition, refused to bargain, and unilaterally changed the wages and working conditions of bargaining unit employees. General Counsel argued that the employer was precluded from repudiating the bargaining agreement, notwithstanding *Deklewa,* because the repudiation was tainted by bad faith.

The Board rejected this argument, stating, "[a]lthough we agree that the [employ-

---

**8.** The focal point of the unions' argument involves the issue of the disclaimer of their section 8(f) agreements with Limbach. It is their position that they had the right to disclaim the agreements upon their natural expiration and that any illegal motive does not negate this right. As a direct consequence of this theory, the unions claim that the instructions given to the jury on the disclaimer issue were erroneous. Over the unions' objection, the court instructed the jury that a disclaimer of representation would be unlawful when undertaken for an objective prohibited by section 8(b)(4). Since the jury instruction issue is directly related to the substantive disclaimer issue itself, it is not discussed separately. Because we find that the disclaimer scheme could be the basis for a section 8(b)(4)(ii) violation, we determine that the instructions to the jury were not erroneous.

er] unlawfully encouraged the decertification effort, misconduct does not warrant an exception to our policy under *Deklewa.*" *Id.* at 993. The unions rely on *Yellowstone* for the proposition that "[m]otive ... is irrelevant under *Deklewa* principles." The unions claim that "the employer's nullification of the § 8(f) collective bargaining relationship is as effective and as unassailable when based upon motives otherwise impermissible under the statute as when undertaken for other reasons."

Similarly, the unions rely on *Garman Construction Co.*, 287 N.L.R.B. 88 (1987), in which the Board reversed an administrative law judge's finding that an employer had violated section 8(a)(5) of the NLRA by refusing to recognize and bargain collectively with certain unions. In *Garman*, by the time the employer refused to bargain with the union, its section 8(f) agreement had expired. Thus, applying *Deklewa,* the Board found that the employer was not obligated to bargain with the union. Since the administrative law judge's conclusions regarding the violations turned on whether the employer had bargaining obligations to the union, the Board found the allegations had to be dismissed. 287 N.L.R.B. at 88–89.

The issue in this case differs from that in *Deklewa.* Here the issue is whether either party may repudiate the bargaining relationship upon the expiration of the agreement where the object of the repudiation is one forbidden by the NLRA itself, an issue the Board clearly did not decide in *Deklewa.* The unions nonetheless rely on language in *Deklewa* to the effect that section 8(f) agreements are voluntary, pointing out that *Deklewa* indicated that "upon the expiration of [a Section 8(f)] agreement ... either party may repudiate the 8(f) bargaining relationship." *Deklewa,* 282 N.L.R.B. at 1377–78. According to the unions, this principle is based on the fact that "Congress plainly mandated that 8(f) agreements be voluntary." *Id.* at 1381.

Despite the unions' effort to fit this case into the holding of *Deklewa,* that case simply does not address the issue before this court. In *Deklewa,* there were no allegations that the refusal to bargain was predicated on an improper motive. The issue before the Board in *Deklewa* was whether the section 8(f) agreement could be unilaterally repudiated during its existence. Simply stated, it assumed that there was no illegal objective to the repudiation other than the repudiation itself.

Further, the unions' argument as to the voluntary nature of the section 8(f) agreement is belied by the decision in *Deklewa.* The Board did state that section 8(f) agreements are voluntary but the Board further stated that, "it simply does not necessarily follow that because a section 8(f) agreement can only be entered into voluntarily either party to the agreement is unfettered in its right 'voluntarily' to repudiate the agreement." 282 N.L.R.B. at 1381. In fact, it is this limitation which the Board effectuated in its holding that the employer could not unilaterally repudiate the section 8(f) agreement during its term.

Furthermore, the statement in *Yellowstone* that "misconduct does not warrant an exception to our policy under *Deklewa,*" *Yellowstone,* 286 N.L.R.B. at 993, has no applicability to this case since in *Yellowstone,* once the pre-hire agreement expired, there was nothing illegal about the employer's objective in repudiating the agreement. However, in the present case, the record makes it clear that the unions' actions had the illegal objective of coercing Harper into bargaining with an uncertified union or forcing Limbach to disassociate itself from Harper. Indeed, there is not a scintilla of evidence to support a conclusion that the unions would have disclaimed if Harper had become a union shop upon Carlough's demand.

In reaching our result we do not write on a blank slate for *Gottfried v. Sheet Metal Workers' Local No. 80,* 876 F.2d 1245, 1250 (6th Cir.1989), supports Limbach's argument that the unions could not freely repudiate the section 8(f) agreements upon their expiration since the objective of the repudiation was illegal under the NLRA. *Gottfried* involved the same disclaimer scheme at issue in this case but was concerned with Local 80 in Detroit, against which Limbach

had filed unfair practice charges. The allegations were virtually identical to those made here, that is, that the unions refused to bargain with Limbach over the renewal of pre-hire agreements and threatened Limbach employees with sanctions for continuing to work for Limbach after the expiration of the pre-hire agreement, the objective being to pressure Harper into signing a labor agreement with an uncertified union. *Id.* at 1246.

After Limbach filed its charges, the regional director of the National Labor Relations Board petitioned for injunctive relief against the union pending the final adjudication of the charges, arguing that the repudiation was an unfair labor practice because it was prompted by an illegal motive. *Id.*

The district court, relying on *Deklewa* and *Yellowstone* for the proposition that the unions had an absolute right to repudiate their collective bargaining relationship with Limbach upon the expiration of the section 8(f) contract regardless of the objective of the repudiation, denied the petition for injunctive relief. The district court found that the contrary theory, posited by the regional director, was so lacking in merit that the regional director could not properly have found reasonable cause to believe that the unions had committed an unfair labor practice. The district court concluded, therefore, that injunctive relief would be inappropriate and that it did not have the power to grant such relief. *Id.* at 1248.

The court of appeals reversed, remanding the case to the district court to consider the merits of the regional director's claim for injunctive relief. The court of appeals found that the regional director's theory was not frivolous and that the Board "could well conclude, ... that an action normally lawful may be unlawful if undertaken to accomplish a forbidden objective." *Id.* at 1247. The court of appeals recognized the general principle that "[i]n the absence of any such improper objective, it is clear that the unions would have been free to terminate their bargaining relationship with Limbach upon the expiration of

the prehire agreement." *Id.* at 1246. This was the holding in *Deklewa. Id.* at 1249.

However, the court found that the decisions in *Deklewa* and *Yellowstone* did not answer the questions posed by the regional director's claims in his petition for injunctive relief, in which the variable of improper motive was added to the *Deklewa* scenario. *Id.* Specifically, the court distinguished *Yellowstone* for the reasons discussed above. As the court read *Yellowstone*, "there was nothing illegal about the employer's objective in repudiating the bargaining relationship once the pre-hire agreement had expired. Under the regional director's theory in the case at bar, by contrast, the object of the repudiation was illegal, and the repudiation itself was an unfair labor practice." *Id.* at 1250.

■ Since the issue before the *Gottfried* court was the propriety of the denial of a preliminary injunction, the court of appeals did not definitively pass on the merits of the regional director's theory, as it had only to determine whether the district court was correct in finding the theory totally without merit. It found the theory not to be so lacking and, in reversing the district court's denial of the preliminary injunction, it commented, "[i]f that [coercing Harper into bargaining] was in fact the object of the economic pressure the unions were putting on Limbach by refusing to deal with it, we find it hard to see why the regional director is not correct in suggesting that the unions were violating the secondary boycott provisions of the [NLRA]." *Id.* In finding that the regional director's theory was not frivolous, the court noted that "[t]he secondary boycott provisions of the [NLRA] 'clearly reflect a Congressional attitude that unions should have no power over neutral employers to compel secondary action.'" *Id.* at 1250–51 (quoting *NLRB v. International Bhd. of Elec. Workers*, 405 F.2d 159, 163 (9th Cir.1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969)). Therefore, the right of a union unilaterally to terminate a contractual relationship for legitimate reasons does not extend to terminating for the purpose of applying economic coercion to

achieve a prohibited secondary objective. *Id.* at 1251. [9]

The court of appeals in *Gottfried* has been vindicated by the subsequent history of the unfair labor charges involved in that case. In *Local Union No. 80, Sheet Metal Workers Int'l Ass'n*, 305 N.L.R.B. No. 36 (Sept. 30, 1991), the National Labor Relations Board squarely held that

> [i]t is this secondary object—to enmesh [Limbach] in [the Local 80 and the International] dispute with Harper, with the aim of compelling the latter to recognize the [union]—that renders the [unions'] disclaimers unlawful, and that distinguishes them from other disclaimers the Board has approved. In that respect, the [unions'] disclaimer is like many other actions, such as striking and picketing, which may be perfectly lawful if taken without a secondary objective, but which are condemned by the [NLRA] if done for an unlawful secondary purpose.

Slip op. at 11.

Of course, the decision of the Board in *Local Union No. 80* fully supports our result.[10]

While we find the court of appeal's opinion in *Gottfried* together with the Board's decision in *Local Union No. 80* to be compelling precedents, we do not yet terminate our analysis of the disclaimer scheme. Rather, we further consider it appropriate to review the history of section 8(f) to determine if it has bearing on the issue of whether a disclaimer for an improper purpose may be an unfair labor practice.

Section 8(f) of the NLRA, added in 1959, resulted from the recognition that the nature of the construction industry did not lend itself to successful operation under the provisions of the NLRA as it then existed. Under these provisions, the majority status of a union as the exclusive representative of the employees, once established, was presumed for a reasonable period of time. Upon expiration of the collective bargaining agreement, the employer was not free to withdraw recognition from the union unilaterally unless it had reasonable, good faith grounds for believing that the union had lost its majority status. *Iron Workers*, 843 F.2d at 772.

This presumption, which assumes a stable group of employees, did not function well in the construction field, in which the work force generally does not remain at a single job site long enough to designate a union and, as a result, both the employers and employees encountered problems. *Id.* at 772–73. The employers, who sought to make accurate estimates of their labor costs for project bids, had problems doing so without having union contracts. Similarly, employees lacked benefits of union representation available to other workers. As a result, the "pre-hire agreement" developed in the industry. *Id.* at 773.

However, the Board had determined that pre-hire agreements were illegal and unenforceable because they designated an exclusive union representative without establishing majority status. The Board suggested that the industry seek an exception

9. The administrative law judge before whom the secondary boycott charge underlying *Gottfried* was tried concluded that a section 8(b)(4) violation was not established because Limbach and Harper are not separate employers, a decision appealed to the Board. The unions sought to introduce this decision into evidence but the district court excluded it. As it happens, this decision was repudiated by the Board in *Local Union No. 80, Sheet Metal Workers Int'l Ass'n*, 305 N.L.R.B. No. 36, slip op. at 6–7 (Sept. 30, 1991).

On remand, the district court again refused to issue the injunction. The court of appeals reversed the district court's denial of the injunction as an abuse of discretion based on its determination that the court erred in applying the two-pronged test for injunctive relief. *Gott-*

*fried v. Sheet Metal Workers' Int'l Ass'n Local 80*, 927 F.2d 926 (6th Cir.1991). As the appropriate injunctive relief, the court of appeals ordered that Limbach be treated as a party to the new agreement, pending outcome of the final adjudication of the case before the Board.

10. We note that the Board in *Local Union No. 80* indicated that "notwithstanding certain inadvertent statements in the [panel's] opinion, unions and employers are not free to repudiate their 8(f) agreements while those agreements are in force." Slip op. at 9 n. 10. We do not understand that the panel did feel that section 8(f) agreements could be repudiated during their terms and as an in banc court we agree with the Board on the point.

from Congress and section 8(f) is this exception.

The general objectives of the 1959 amendments to the Act, including section 8(f), have been identified as the promotion and protection of employee free choice and labor relations stability. *See Deklewa,* 282 N.L.R.B. at 1382. Therefore, it is appropriate to measure the positions taken by the unions and Limbach in terms of the extent to which each position achieves the appropriate balance between these dual congressional objectives.

The protection of employee free choice is the focus of attention in the argument made by the unions. They argue that, upon the expiration of the agreement, they were absolutely free to disclaim their section 8(f) agreements with Limbach, and that to hold otherwise would "wreak havoc on the Congressional scheme governing construction industry labor relations." According to the unions, under Limbach's theory, a union, which is clearly not obligated to enter into a section 8(f) agreement with an employer, could be required by the employer to *maintain* a section 8(f) agreement, a rule directly contrary to the holding in *Deklewa* which cannot be squared with the voluntary nature of section 8(f) agreements.

We agree that section 8(f) agreements are voluntary and that neither the union nor the employer is obligated to enter one in the first instance. Further, under *Deklewa,* upon the expiration of the agreement, the union does not enjoy the presumption of majority status available to other unions under the Act. Therefore, both the union and the employer are free to repudiate the agreement and the employer is to be free from coercion intended to convince it to reach a successor section 8(f) agreement.

However, the unions' argument, focusing as it does only on the voluntary nature of section 8(f) agreements, glosses over the variable in this case which did not affect the decision in *Deklewa.* The unions focus on section 8(f), without addressing other sections of the NLRA. The unions' argument diverts attention from the actual issue, which is whether a union can disclaim a section 8(f) agreement in an attempt to achieve illegal secondary objectives prohibited by the NLRA and thus ignores the prohibition of secondary boycotts in section 8(b)(4). Accordingly, while *Deklewa* focused on the voluntary character of section 8(f) agreements, it does not stand for the proposition that, once in a section 8(f) agreement, the parties are free to do whatever they wish. In fact, the holding of *Deklewa* prohibiting the unilateral repudiation of the agreement clearly refutes such a stance. *See also Deklewa,* 282 N.L.R.B. at 1396 n. 13 ("[r]eferences in the legislative history to the 'voluntary' character of prehire agreements focus[ ] on the making or signing of such agreements, not the act of living up to one's contractual promises") (concurring opinion). Thus, as the Board has now made clear in *Local Union No. 80,* in *Deklewa* it was not concerned with and did not decide whether a section 8(f) union's actions which were consistent with its bargaining responsibilities "would also be immune from scrutiny under Section 8(b)(4)(B)."

Furthermore, we find that *employee* free choice is not protected by the unions' stance. Specifically, if the unions' reason for the disclaimers was to further an illegal secondary purpose and if, as Limbach alleged and is clearly the fact, the unions put pressure on and threatened unionized Limbach employees to induce them to quit working for Limbach, it is hard to see how such actions foster *employee* free choice. What is furthered is the continued life and power of the union.[11]

---

11. We note that, although during the term of a section 8(f) agreement neither the *employer* nor the *union* can unilaterally disclaim the agreement, section 8(f)'s final *proviso* specifically preserves the right of the *employees* to vote, pursuant to 29 U.S.C. § 159(e), to decertify or change their bargaining representative. *Deklewa,* 282

N.L.R.B. at 1387. The fact that the unions and/or employers are not free unilaterally to disclaim the agreement promotes stability in the construction industry. *Id.* at 1386. The fact that the *employees* remain free to vote to decertify the union promotes employee free choice. *Id.* at 1381, 1386. Similarly, as discussed *infra,*

The unions suggest that undesirable consequences will follow from restrictions on the powers of unions to repudiate section 8(f) agreements. We point out, however, that our opinion is very narrow and is applicable only in the context of repudiation constituting a secondary boycott. It certainly does not restrain a union from repudiating for a legitimate purpose.

■ We revisit familiar ground in holding that an improper motive may make unlawful what is otherwise unassailable conduct. Thus, in *Kenrich Petrochemicals, Inc. v. NLRB*, 893 F.2d 1468 (3d Cir.), *on rehearing*, 907 F.2d 400 (3d Cir.) (in banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 509, 112 L.Ed.2d 522 (1990), we held that, while ordinarily a supervisor is not a protected employee within the NLRA, her discharge may be an unfair labor practice if it interferes with, restrains, or coerces protected employees in the exercise of their right to engage in protected activity. Therefore, we recognized that the issue in *Kenrich* was whether the National Labor Relations Board "in seeking to vindicate the statutory rights of rank and file employees, may limit an employer's otherwise unfettered right to discharge a supervisor." 893 F.2d at 1477. We held that it could.

■ We also find that the second objective of the NLRA, stability in the construction industry, would not be promoted by the adoption of the unions' position on the disclaimer issue. Just as the decision in *Deklewa* promoted stability in the industry by precluding parties from unilaterally repudiating their *voluntary* agreements, precluding a union from disclaiming for an illegal secondary objective promotes stability. Both the employer and the union will better know their rights and obligations vis-a-vis a section 8(f) agreement. This helps remove doubt and avoid adversarial proceedings as a way to resolve disputes, and thus tends to effectuate the statutory policy of labor relations stability. *Deklewa*, 282 N.L.R.B. at 1383. *See also Sheet*

*Metal Workers' Local Union No. 20 v. Baylor Heating and Air Cond., Inc.*, 877 F.2d 547, 554 (7th Cir.1989) (collective bargaining agreements promote stability).

Finally, precluding actions such as those taken by the unions here fulfills general statutory policies by integrating section 8(f) with other sections of the NLRA, namely section 8(b)(4). In *Deklewa*, the Board found that there was nothing in either the text or the legislative history of section 8(f) to suggest that it was intended to leave construction industry employers free to repudiate contracts at will. 282 N.L.R.B. at 1388. As a result, it found the employer's unilateral repudiation violated section 8(a) and was an unfair labor practice. *Deklewa* reflects the notion that Congress did not intend section 8(f) and section 8(f) agreements to operate in a vacuum, unaffected by the rest of the NLRA. *See also NLRB v. Irvin*, 475 F.2d 1265, 1271 (3d Cir.1973).

Section 8(b)(4) shields unoffending employers from pressures in disputes not their own while preserving the rights of unions to bring pressure on offending employers in primary labor disputes. *Anderson*, 422 F.Supp. at 1384. We find that there is nothing in the text or history of section 8(f) to suggest that the actions of a union with regard to a section 8(f) agreement are free from the section 8(b)(4) prohibitions against secondary boycotts. *See also Deklewa*, 282 N.L.R.B. at 1387 (Congress intended, and the structure of section 8(f) contemplates, limited linkage between section 8(a)(5) and section 8(e)). In *Deklewa*, the Board noted that, simply because section 8(f) agreements are easier to obtain, this does not mean that Congress intended them to be voidable at will. 282 N.L.R.B. at 1383 n. 31. Similarly, we find that simply because section 8(f) provides a special method for union recognition for the construction industry, there is no reason to believe that Congress intended a union to be free to coerce a neutral employer into forcing a sister company to enter

unions are prohibited under section 8(b)(7)(C) from using coercive recognitional picketing to obtain a section 8(f) agreement. This further

protects employees' representational desires. 282 N.L.R.B. at 1381.

into a section 8(f) agreement through disclaiming agreements with the neutral company, thereby thwarting the section 8(b)(4) prohibitions against secondary boycotts. The purposes of section 8(f) should not be achieved at the expense of the purposes of section 8(b)(4).

In fact, in further protection of employee free choice, the 1959 amendments to the NLRA provided that the limitations on coercive recognitional picketing contained in section 8(b)(7) apply to a union seeking to *obtain* a section 8(f) agreement. *Deklewa*, 282 N.L.R.B. at 1381; *Iron Workers*, 843 F.2d at 773. *See also Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 632, 95 S.Ct. 1830, 1840, 44 L.Ed.2d 418 (1975) ("[o]ne of the major aims of the 1959 Act was to limit 'top-down' organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees"). The Board in *Deklewa* noted that there was no legitimate basis for not applying this rule to "successor 8(f) agreements." 282 N.L.R.B. at 1385.

We recognize that the unions see double-breasting as a serious threat to their survival in the construction industry and that the Integrity Clause/disclaimer scheme here was a direct result of such concern. However, the law does not prohibit the actions taken by the parent of Limbach and, as long as the separate employer status is maintained, Limbach is a neutral employer protected by the secondary boycott provisions. *See C.E.K. Indus. Mech. Contractors, Inc. v. NLRB*, 921 F.2d 350, 352 n. 3 (1st Cir.1990) (citations omitted). The union can still direct its activities toward a primary employer and is not precluded from seeking to unionize Harper in a legitimate way. However, as long as

Limbach is a separate employer, it is protected from coercion. The unions in this case seek our approval to do what Congress has not seen fit to authorize: they ask us to permit them to be free to force a corporate parent to direct its separate subsidiaries to be either all union or all nonunion. This we will not do.

As a tangential issue on the section 8(b)(4)(ii) claim, the unions argue that the prohibition in section 8(b)(4)(ii) against *coercion* should not be read to include the unions' disclaimer of their section 8(f) agreements. The unions cite the Supreme Court as stating that the words, "threats, coercion, or restraints," as used in the statute are "nonspecific, indeed vague," and should be interpreted cautiously without a "broad sweep...." *DeBartolo Corp. v. Florida Gulf Coast Trades Council*, 485 U.S. 568, 578, 108 S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988). The unions assert that the Supreme Court has declined repeatedly to allow the concept of coercion to swallow up a range of activity left unregulated.

We reject this argument as applied to the circumstances here. We hold that a union's walking away from a bargaining relationship can constitute coercion within the meaning of section 8(b)(4)(ii) of the NLRA.[12]

Coercion has been defined as "non-judicial acts of a compelling or restraining nature, applied by way of concerted self help consisting of a strike, picketing *or other economic retaliation or pressure* in a background of a labor dispute." *Local Union No. 48, Sheet Metal Workers International Ass'n v. Hardy Corp.*, 332 F.2d 682, 686 (5th Cir.1964) (emphasis added). We hold that the threat of cancelling their bargaining agreement could be a powerful economic weapon in the hands of the unions which, if used for prohibited reasons,

12. While we will remand the case for a new trial on the disclaimer issue, we do not imply that we are precluding Limbach from moving for partial summary judgment on this point. As the panel pointed out, it may well be that the uncontested facts would establish that the unions committed an unfair labor practice as a matter of law, as it seems clear that the disclaimers were not intended to be permanent,

for Carlough explained at the 1986 convention that Limbach would be welcome back in the union family if Harper became a union shop. Limbach, understandably, did not press this point in its brief, as it is defending a verdict and therefore urges that "the evidence supports the jury's verdict that the unions violated section 8(b)(4)(ii)."

constitutes coercion within the meaning of the NLRA. *See Sheet Metal Workers Local 91 v. NLRB,* 905 F.2d 417, 424 (D.C.Cir. 1990) ("[i]t is well established that the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4)").

The unions argue that our decision does not leave them in parity with Limbach as Limbach could repudiate the section 8(f) agreements upon their expiration. While this may well be true, it proves nothing as section 8(b)(4) of the NLRA provides that it is an unfair labor practice "for a labor organization or its agents" to engage in unlawful secondary boycotts. The lack of parity is simply a consequence of the law as enacted by Congress. We also recognize that the continuation of the section 8(f) relationship when a party seeks to terminate it may in some circumstances create practical problems. However, this is not a valid reason to refuse to enforce secondary boycott law for there are certainly no such practical problems in this secondary boycott damages action. Furthermore, the regional director of the National Labor Relations Board and General Counsel in the *Gottfried* litigation obviously thought that the problems were not insurmountable as they sought and ultimately obtained injunctive relief treating Limbach as a party to a new agreement after Local 80 refused to bargain over the renewal of the section 8(f) agreement and Limbach filed charges with the Board. In any event, in an NLRB proceeding the Board will fashion appropriate relief if it finds that a disclaimer is an unlawful secondary boycott, which is exactly what it did in *Local Union No. 80.*

## VI.

### SEPARATE EMPLOYER ISSUE

The unions claim that Limbach and Harper are not separate employers within sec-

tion 8(b)(4) and therefore the unions did not have a secondary motive under this section. In order for there to be a secondary motive to the unions' disclaimers, a neutral employer must be the object of union "coercive actions." In this case, Limbach's theory is that it had no labor dispute with the unions, and therefore was a neutral employer, and that the unions' dispute was with Harper, which for 30 years had been a nonunion shop. The unions' position is that Limbach and Harper are not separate employers within the meaning of the secondary boycott provisions of the NLRA, and therefore the unions could not have a secondary motive in disclaiming the section 8(f) agreements and, as a matter of law, they could not be liable for a section 8(b)(4) violation.

The jury determined that Limbach and Harper are separate employers and the court denied the unions' motions for a directed verdict and a judgment notwithstanding the verdict on this issue. On appeal, the unions advance two reasons why the denial of these motions was error and why the jury determination cannot stand. First, the unions claim that the instructions given to the jury were fatally erroneous. Second, the unions assert that, "on the facts adduced at trial, and applying a proper legal standard, the trial court should have granted the directed verdict requested by the defendants on this issue...." We have considered both alleged errors and reject them.[13]

#### a. *Jury Instructions*

The unions requested that the following instruction be given on the "separate employer" status of Limbach, Limbach Constructors and Harper:

> Separate corporate subsidiaries are separate employers if neither the subsidiaries

---

**13.** The unions also argued in their brief that it was reversible error for the district court to exclude from evidence the decision of an administrative law judge recommending dismissal of a complaint against the International Union and Local 80 on the ground that Limbach was not a neutral employer. However, they did not mention this point in their petition for rehearing and we do not regard it as being before the in banc court. We also point out that the decision of the administrative law judge was repudiated on this point by the Board in *Local Union No. 80,* slip op. at 6–7 & n. 7, and in the circumstances we certainly would not at this time reverse by reason of exclusion of this evidence.

nor the parent exercises control over the operations or labor relations of the other. However, if you find that Limbach Company exerts control over the operations and labor relations of Harper, or if you find that Limbach Constructors, Inc. exerts control over the operations and labor relations of Limbach Company and Harper, then you should find that Limbach Company and Harper are not separate employers. If you find that Limbach Company did not exercise control over the operations or labor relations of Harper, and if you find that Limbach Constructors, Inc. did not exercise control over the operations or labor relations of Limbach Company and Harper, then you should find that Limbach Company and Harper are separate employers. *I instruct you that the imposition of a non-union framework upon a corporate subsidiary indicates a substantial degree of central control over labor relations.* In this case, the test of separate employer status is whether, taken as a whole, the management, ownership, financial control, inter-relation of operations and control of operations among Limbach Constructors, Inc., Limbach Company and Harper is *characteristic of the arm's length relationship found among unintegrated companies.* As I have already instructed you, plaintiff has the burden of proving that Limbach Company and Harper are separate employers.

App. at 3412 (emphasis added).

The unions' requested instruction was denied and over the unions' objection the following instruction was given by the district court:

The following are general principles of law regarding separate employers: whether Limbach Company and Harper are separate employers for purposes of the National Labor Relations Act depends upon an analysis of the following

factors: one, the interrelationship of the operations; second, common management; third, centralized control over labor relations; and, fourth, common ownership.

While none of the factors, separately viewed, is controlling, you should particularly consider the first three factors to determine whether there was a functional integration of these companies and, especially, whether there was centralized control of labor relations.

Separate employer status depends upon all of the circumstances of the case, and not all of the controlling factors need to be present.

Separate corporate subsidiaries are separate employers if neither the subsidiaries nor the parent exercises *actual* control over labor relations or the overall operations of the other.

*Common ownership* and *potential control* alone will not establish that otherwise separate employers are a single employer. Rather, there must be *actual* or *active control* over the labor relations or the overall operations.

If you find that Limbach Constructors, Inc. exerted *actual* control over the labor relations or the overall operations of Limbach Company and Harper, then you should find that Limbach Company and Harper are not separate employers.

However, if you find that Limbach Constructors, Inc. did not exercise *actual* control over the labor relations or the overall operations of Limbach Company and Harper, then you should find that Limbach Company and Harper are separate employers.

App. at 3472–74 (emphasis added).

 We find no shortcomings in the district court's jury instructions and no error in the court's refusal to give the requested instructions.[14] Even the unions ac-

---

**14.** Judge Stapleton questions the helpfulness in this context of addressing a jury concerning "potential control." While it is likely that the district court used this phrase to refer to the ability of a corporate stockholder to alter the policy of a subsidiary by changing its managing personnel, the phrase "potential control," with-

out further explanation, is problematic in this context. Maintenance of the status quo requires no affirmative exercise of power. Where a parent has previously established an open shop policy for a subsidiary and while retaining the current power to reverse that policy, has simply chosen thus far not to do so, there is a risk that

knowledge that the district court's instructions correctly identified the four criteria ordinarily used to determine the separate employer issue and advised the jury that centralized control over labor relations is the most important factor.[15] The jury charge adequately instructed the jury that the issue before it was whether Limbach and Harper, two formally separate entities, were actually part of a single integrated enterprise so that for purposes of the NLRA there was in fact only a single employer. *See NLRB v. Browning–Ferris Industries of Pennsylvania, Inc.,* 691 F.2d 1117, 1122 (3d Cir.1982) ("[t]he question in the 'single employer' situation, then, is whether the two nominally independent enterprises, in reality, constitute only *one integrated enterprise*") (emphasis in original).

Viewed in light of the evidence, the instructions given did fairly and adequately submit the issue of employer separateness to the jury and would not have mislead the jury. In fact, we note that the district court took added care to avoid instructions which might have confused the jury. The charge adequately apprised the jury that it should consider the four criteria to determine whether Limbach and Harper were separate employers and informed the jury that the control over labor relations was to be the focus of its consideration, as the unions requested in their request to charge.

b. *Denial of Motions for a Directed Verdict and Judgment Notwithstanding the Verdict*

On July 10, 1990, the unions unsuccessfully moved for a directed verdict on the

basis, *inter alia,* that Limbach, Limbach Constructors, Inc. and Harper are a single employer and that no reasonable jury could conclude otherwise. The unions made the same arguments in a motion for judgment notwithstanding the verdict, and in a renewed motion for judgment notwithstanding the verdict, both of which were denied.

On appeal, the unions assert that it was error for the court to deny their motions, arguing that the evidence before the jury left no question that Limbach and Harper are not separate employers within the meaning of the NLRA. We, however, find that, based on the evidence presented to the jury, the district court did not err in denying the motions.

 Corporate subsidiaries are normally treated as separate persons under the NLRA. *United Telegraph Workers v. NLRB,* 571 F.2d 665, 667 (D.C.Cir.), *cert. denied,* 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). Accordingly, separate employer status is usually a question of fact to be resolved by the jury. *Sheet Metal Workers Int'l Ass'n, Local Union No. 223, AFL–CIO v. Atlas Sheet Metal Company of Jacksonville,* 384 F.2d 101, 107 (5th Cir.1967). However, corporate subsidiaries may lose their status as separate persons when they are operated as a single business enterprise, a determination based on four factors: (1) common ownership; (2) interrelation of operations; (3) common management; and (4) centralized control of labor relations. *Radio & Television Broadcast Technicians Local 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965); *Eichleay Corporation v. International Ass'n of Bridge, Structural and*

---

a jury might regard the parent as having only "potential control." The unions did not object to the use of this phrase by the district court, however, and Judge Stapleton does not regard this segment of the charge as rising to the level of "plain error." Fed.R.Civ.P. 51.

**15.** We review the charge to determine "whether the charge, taken as a whole and viewed in light of the evidence, fairly and adequately submits the issues in the case to the jury," and reverse "only if the instruction was capable of confusing and thereby misleading the jury." *Link v. Mercedes-Benz of North America, Inc.,* 788 F.2d 918,

922 (3d Cir.1986). When interpreting jury instructions, the reviewing court considers the totality of the instructions and not a particular sentence or paragraph in isolation. *In re Braen,* 900 F.2d 621, 626 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). Failure to instruct the jury as requested does not constitute error so long as the instruction, taken as a whole, properly apprises the jury of the issues and the applicable law. *Gutzan v. Altair Airlines, Inc.,* 766 F.2d 135, 138 (3d Cir. 1985).

*Ornamental Iron Workers,* 944 F.2d 1047, 1059 (3d Cir.1991). The district court described each of these factors to the jury in its charge. Furthermore, we have recognized that these four criteria are used to determine if related entities are a single employer in assessing whether the enterprise has committed an unfair labor practice in the construction industry by maintaining double-breasted union and nonunion operations so that the representative of the unionized entity is not recognized by the employer as the representative of the non-union employees. *See NLRB v. Al Bryant, Inc.,* 711 F.2d 543, 551 (3d Cir. 1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984). Therefore, we review the evidence presented to the jury in light of these four factors to determine if the unions were entitled to a directed verdict or a judgment notwithstanding the verdict on this issue.

Walter Limbach was the prime source of evidence on this point. He testified that Limbach was reorganized for the purpose of expanding operations into new growth areas via open shops, *i.e.,* nonunion operations, and that Jovis was specifically formed to acquire nonunion operations. Walter Limbach acknowledged his understanding that, in order to succeed in keeping these new acquisitions "open," Limbach and the new acquisition, (ultimately Harper), would have to be considered separate employers. Therefore, he sought legal advice on how to ensure that Limbach and Harper would be considered separate employers.

In our analysis on this point we first acknowledge that both Limbach and Harper were owned by the same parent, Limbach Constructors, Inc., so that the common ownership criterion is satisfied. However, since common ownership is always present in a sister-corporation situation, it alone does not establish single employer status. *United Telegraph Workers,* 571 F.2d at 667. Since potential control would always rest with the parent in such a situation, what is required is actual control. *See, e.g., American Federation of Television & Radio Artists v. NLRB,* 462 F.2d 887, 892 (D.C.Cir.1972).

As to interrelation of operations, Walter Limbach testified that Limbach and Harper maintain separate offices and separate bank accounts, and do not work or compete with each other on any projects. There are no intercompany loans or cross-guarantees on performance bonds and there is no shifting back of employees from one company to another, though several Limbach executives resigned to work for Harper after it was acquired by Jovis.

On centralization of management, Walter Limbach testified, that after the restructuring, some staff functions were centralized in Limbach Constructors, and that each subsidiary pays Limbach Constructors for these services. But each company has its own president. According to Walter Limbach's testimony, these presidents ran Limbach and Harper independently. However, although Limbach and Jovis had separate boards of directors, these boards were non-operational, except to fulfill legal requirements, and the presidents of both companies reported directly to Walter Limbach.

On the critical issue of centralized control over labor relations, Walter Limbach stated that each chief officer is responsible for the labor relations of his company. He testified that, whereas the centralization of management functions discussed above was intended to benefit all of the subsidiaries, labor relations were intentionally kept decentralized.

Walter Limbach testified that each subsidiary handled its own labor relations. In particular, he testified that he was not in charge of any labor decisions of Harper, and could not force Harper into signing a collective bargaining agreement with the union because he was without authority to do so. Indeed, he was not an officer of Harper. According to Walter Limbach's testimony, George Harper, or his replacement, was the decision maker as to whether Harper would operate union or non-union.

We note, however, that when Carlough first approached Walter Limbach about the Harper operation, Walter Limbach did not totally disassociate himself from the situa-

tion. In fact, he met alone first with Carlough's assistant, Cassidy, and later with Carlough himself to discuss the matter, although on both occasions he stated that he had no authority to bind Harper to a collective bargaining agreement. Walter Limbach testified that he met with Cassidy and Carlough at the request of Limbach's president, because the union representatives approached him. However, he maintained that he made no proposals on behalf of Harper at these meetings. He further testified that he never advised Harper's management on the issue.

Subsequent to the unions' disclaiming the section 8(f) agreements, Walter Limbach presided over strategy meetings held to determine how to respond to the locals' disclaimers. He sent memos to Limbach's president and to branch managers containing advice on handling post-disclaimer labor and business problems. However, Stephen Wurzel, president of Limbach, and Paul Stock, Los Angeles branch manager, testified that they did not always accept the advice in the memos.

Viewing the evidence in the light most favorable to Limbach, we cannot say that there was no question of material fact for the jury and that any verdict other than the one sought by the unions would be erroneous under the governing law. *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir.1987). Thus, the district court's denial of the directed verdict motion will be affirmed.

■ Although some of Walter Limbach's testimony disclosed a fair amount of control over the operations of the whole organization and a certain amount of centralized management, he also testified that it was always intended that each subsidiary direct its own labor relations and that they did so. Thus, he testified in fact that labor relations decisions were made by individual subsidiaries. Therefore, in light of the factors to be used to determine separate

employer status, there was an issue of fact for the jury.

Similarly, we find that the record is not so critically deficient of a minimum quantum of evidence from which a jury might reasonably have reached its conclusion so as to require us to reverse the district court's denial of the motion for judgment notwithstanding the verdict. *Kinnel v. Mid–Atlantic Mausoleums, Inc.*, 850 F.2d 958, 961 (3d Cir.1988). Although there is evidence to support the unions' claim that Limbach and Harper are not separate employers, as discussed above, there was also evidence from which a jury could determine otherwise. It cannot be said that the record reflects so little evidence of separateness that the jury's verdict should have been overturned.

■ We also reject the unions' suggestion that the separate status of Limbach and Harper should be viewed with extra scrutiny in view of Walter Limbach's acknowledgement that a purpose of the reorganization and formation of Jovis was so the organization could acquire nonunion shops. The four factors discussed above are those to be considered in determining the separate status issue and employer motive is not one of those factors.[16] Furthermore, it is not improper for an employer to wish to conduct its activities on a nonunion basis. Indeed, it would be remarkable to hold that the very fact that an organization is attempting to order its affairs so as to satisfy legal standards gives reason in itself to question whether it has succeeded. If anything, quite the opposite might be thought to be true.

We find instruction as to the approach to take in this matter in recent opinions of this court which arose in different situations in labor law cases but which also involved questions of the separate status of corporate entities. In *Eichleay Corporation v. International Ass'n of Bridge, Structural and Ornamental Iron Work-*

---

**16.** The four factors of the single employer test focus on the *current* relationship of two purportedly separate employers. The past is relevant only to the extent it bears upon the present. Accordingly, the fact that the purpose of the original reorganization was to create a double-breasted situation is relevant, only to the extent it may shed light on whether Walter Limbach or Limbach Constructors has current *de facto* control over whether Harper does or does not enter an agreement with a union.

ers, 944 F.2d 1047, we entertained an appeal by certain unions from an order of the district court vacating arbitration awards favorable to the unions in a grievance against Eichleay Corporation. The grievance asserted that Eichleay violated the collective bargaining agreements by establishing an alter ego nonunion corporation and by directing work to it which should have been performed by union employees. Thus, the unions in *Eichleay* prevailed in arbitration on a claim somewhat like that on which the unions in this case were unsuccessful in the arbitration before the National Joint Adjustment Board. In *Eichleay* we reversed the district court and ordered that the arbitration award on this point be confirmed. In our opinion we pointed out that "elements necessary for a finding of alter ego status are substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership between the two corporations" and thus an inquiry into whether there was an alter ego situation "is essentially the same as that used for a finding of single employer status." *Id.* at 1059. We then stated that in "determining single employer status, four elements are considered: interrelationship of operations, common management, centralized control of labor relations, and common ownership." *Id.* In *Eichleay*, unlike here, it appears that very little effort was made to keep the corporations separate, for as we pointed out in *Eichleay:*

> In this case, there was ample evidence from which the arbitration panel could conclude that ECI and Eichleay were alter egos. ECI and Eichleay were both wholly owned subsidiaries of Eichleay Holdings, Inc. There was evidence that ECI and Eichleay shared office space and clerical staff. High ranking corporate officers were transferred between Eichleay and ECI. The companies shared common services for estimating, sales, accounting, data processing, check writing, invoice processing and payment, and computer services. Eichleay set up and guaranteed a line of credit for ECI, and loaned ECI cash without a written agreement or set date for repayment. Ei-

chleay guaranteed ECI's portion of the Pitcal job. There was evidence that ECI and Eichleay were both controlled by Geoff Eichleay, and that Geoff Eichleay made the major decisions for both companies, including the decision that Eichleay should drop out and ECI should bid on the Pitcal job.

*Id.*

Furthermore, *Eichleay* differs from this case for the fundamental reason that Harper had been a nonunion enterprise long before its purchase whereas in *Eichleay* the nonunion operation was newly created.

■■■ The prime significance of *Eichleay* for us is its emphasis on our appropriate scope of review. As we pointed out in *Eichleay*, a court's view of an arbitration award is "extremely deferential" and thus an award must be confirmed unless it is "irrational." *Id.* That test is not exactly the same as that which we use in reviewing the orders denying a directed verdict and a judgment notwithstanding the verdict, but it is similar. Thus, just as the arbitration award in *Eichleay* could not be vacated neither can the verdict on the separate employer issue in this case.

We followed the same deferential approach in *NLRB v. Omnitest Inspection Services, Inc.*, 937 F.2d 112 (3d Cir.1991), a matter involving an application by the National Labor Relations Board for enforcement of an order which depended upon a successor corporation being an "alter ego" of its predecessor. We enforced the order, holding that "[t]he determination that an alter ego exists is a question of fact for the Board, which we must uphold if, upon review of the entire record, it is supported by substantial evidence." 937 F.2d at 121. Of course, in *Omnitest* we used precisely the same test that we had previously used in reviewing the Board's conclusion in a double-breasted situation that there was a single employer. *NLRB v. Al Bryant, Inc.*, 711 F.2d at 551.

In reaching our result we have not ignored the unions' argument that whatever may be true in other contexts, Limbach cannot be deemed "neutral" with respect to

Harper for purposes of secondary boycott law. Rather we see no basis by reason of this argument to limit our usual holdings determining when related entities are separate. The matter is essentially a definitional problem. Once it is determined as a matter of fact, as happened in this case, that the entities are separate, then they are neutral. Indeed, it would be difficult to conclude otherwise in view of our opinion in *Al Bryant Inc.*, which used the standard criteria to determine if entities were separate in a double-breasting situation.

■■■ We close on the separate employer issue with one final thought. While the unions suggest that there is something novel in our holding on the separate employer issue this is simply not so. Indeed, the court in *Gottfried v. Sheet Metal Workers' Local No. 80* flatly indicated that "Limbach and Harper are separate 'persons' within the meaning of the secondary boycott provisions of the [NLRA]." 876 F.2d at 1247. While obviously the context of that decision was somewhat different from that here as the court was only concerned with injunctive relief pending the Board's decision, the fact is that the court's statement was absolutely unqualified and some showing of separateness was required so that it would be determined that the regional director's theory of the case was not totally without merit. The bottom line is that we are applying standard principles of law in accordance with the appropriate standard of review in an unexceptional way. *See also NLRB v. International Union of Operating Engineers, Locals 542, etc.,* 532 F.2d 902, 908 (3d Cir.1976),

*cert. denied,* 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977). If there could be any doubt about this, it was surely removed by the National Labor Relations Board in *Local Union No. 80* which, after holding that Harper and Limbach were separate employers, added the following:

> Our dissenting colleague claims that Harper is not in fact a 'neutral employer' within the meaning of the Act. If our colleague means that Harper is [Limbach's] ally, we note that he offers no evidentiary support for this proposition, and we find none. Thus, there is no probative evidence that would support a finding that Harper performed struck work for [Limbach], or is part of a single integrated enterprise with [Limbach]. The burden to prove such a relationship is on the [unions], and that burden plainly has not been met here. *If, however, our colleague is contending that there is something special about double-breasted companies that requires the Board to deviate from its usual single-integrated-employer analysis, we disagree. Our colleague has not cited any case supporting such a proposition.*

Slip op. at 7 n. 5 (citations omitted and emphasis added).[17]

## VII.

## CONCLUSION

For the foregoing reasons a judgment will be entered consistent with the panel's opinion of July 9, 1991, and this opinion.

---

**17.** The decision of the National Labor Relations Board in *Local Union No. 80* was not brought to our attention until after the oral argument in this case. When we received it we asked for supplemental briefing regarding the impact of that case, which we have now received. Limbach argues that we should give preclusive effect to that decision. The decision is germane on three issues: (1) whether the unions violated section 8(b)(4)(i), the board decision being inconsistent with the panel opinion on that point; (2) whether the unions violated section 8(b)(4)(ii) by disclaiming; and (3) whether Limbach and Harper are separate employers. We decline to give it preclusive effect for the following reasons. As we have already explained, Limbach's claim has not been preserved for our

consideration under section 8(b)(4)(i). Furthermore we are affirming the determination of the jury that Limbach and Harper are separate employers and thus the preclusive effect issue is moot on that point. This leaves only the issue of whether there was a section 8(b)(4)(ii) violation for consideration under Limbach's preclusive effect argument. We think it is very doubtful that the decision of the board can be preclusive on this point, as Local 108 was not a party to the board's proceedings and different disclaimers were involved. But rather than conclusively passing on the point, we instead do not preclude Limbach from making any argument it deems appropriate regarding the preclusive effect of the board decision on remand.

SLOVITER, Chief Judge, dissenting.

I respectfully dissent from the decision of the majority. The spectre of a large damage verdict, such as the more than $2.8 million awarded in this case, impermissibly tilts the level playing field designed by Congress.

Until this case, no court has held that the secondary boycott provisions of the National Labor Relations Act are applicable when a labor union disclaims further interest in representation of the workforce in an effort to protect its members from the effects of the double breasted operations of the employer. The majority reaches its conclusion by holding that Limbach is a secondary employer for purposes of the secondary boycott provisions of section 8(b)(4). I believe this is erroneous as a matter of law. I also believe that the unions' disclaimer of further negotiation following the expiration of a section 8(f) agreement cannot reasonably be within the scope of section 8(b)(4)(ii) merely because the unions are motivated by the desire to unionize the other half of a double breasted operation. I view the majority's conclusion that the disclaimers are tainted by the desire to unionize a nonunion company to be erroneous as a matter of law.

I.

*Background of Double Breasting*

This dispute, which centers on the practice of double breasting and the unions' efforts to counteract it, can be understood only by some examination of the underlying economic and business conditions set forth in publicly available sources of information.

The construction industry is one of the few remaining highly fragmented industries in the United States. Nonetheless, there is a decided trend towards larger regional or national companies in order to diversify geographically, particularly in the Sunbelt. *See* Donald B. Thompson, *Shakeout Was Due; Merger Mania Hits Construction Industry,* Industry Week, May 17, 1982, at 88 (hereafter Thompson, Industry Week).

Unionization in the construction industry has been on the decline since the mid–1950s. *See* David Wallace, *Non–Union Contractors Gain a Firmer Foothold,* Philadelphia Business Journal, June 19, 1989, at 1. It has been reported that between 1984 and 1988 the percentage of nonunion construction done in the five-county area around Philadelphia increased from 56% to 70%, *see id.,* and between 1980 and 1987 the percentage of nonunion construction in the Albany–Colonie, New York, area soared from about 5% to about 50%, *see* Tim Cavanaugh, *As Non–Union Workers Grab Jobs: Construction Unions Fight to Regain Ground,* Capital District Business Review, August 31, 1987, at 15. Nationwide, only about 30% of construction companies are now unionized, as compared to about 75% just ten years ago. *See* Gary Eisler, *The Right Man at the Right Time,* Oregon Business, July 1989, at 29.

The increase in nonunion work has driven, and in turn been driven by, double breasting. Double breasted operations began to pervade the construction industry in the late 1970's after they received the Board's imprimatur of approval. *See* Comment, *Double–Breasted Operations In The Construction Industry: A Search For Concrete Guidelines,* 6 U. Dayton L.Rev. 45–47, 50 (1981) (Dayton Comment). Double breasting permits contractors who wish to compete for nonunion jobs also to bid for those contracts that require unionized workers due to state and federal laws or the desire of the firm engaging the contractor to avoid disputes with its own employees. As this court has previously recognized "[a] contractor engaged in a double breasted operation has the best of both worlds, since it can bid through its union company when jobs require union contractors but can underbid a unionized company through its second operation on jobs that do not require union contractors." *NLRB v. Al Bryant, Inc.,* 711 F.2d 543, 552 (3d Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984).

Increasingly, unionized companies become double breasted operations by acquiring existing nonunion companies in the

Sunbelt, where unionization is lowest, rather than by creating new subsidiaries. A management consultant has explained that it is advantageous to acquire an existing company because: "You get a firm with a labor-relations history, it's functioning as an open shop, you get people who understand an open-shop operation, and you feel you're a lot cleaner in the eyes of the NLRB than carving out a piece of your own organization and sending it across the street." Thompson, Industry Week, May 17, 1982, at 88.

Although there may be some transfer of work from the unionized portion to the nonunionized portion of the same corporate enterprise, the major effect of double breasting on unionized employees is a reduction in their wages and benefits. *See* Bruce Hyland, *Unions Lash Out at Double Breasting*, Business First—Buffalo, August 5, 1985, at 1. Insofar as double breasting increases nonunion competition, unions will be pressured to give wage concessions and "givebacks" so that their employers can remain competitive in a growing nonunion environment. As one commentator has noted:

> double-breasting poses a significant threat to the labor movement. From the union perspective, double-breasting improperly permits an employer to shed bargaining and contractual responsibilities while still retaining the financial benefits of ownership. Double-breasting not only diverts work to the nonunion sector, but it also puts considerable pressure on unions to grant wage and benefit concessions so that the shrinking number of union firms will remain competitive.

Stephen F. Befort, *Labor Law and the Double–Breasted Employer: A Critique of the Single Employer and Alter Ego Doctrines and a Proposed Reformulation,* 1987 Wis.L.Rev. 67, 69.

It is not for this court, or even the National Labor Relations Board, to align itself with one party or the other in a double breasted situation. We must recognize, however, that an employer's ability to become a double breasted operation can substantially affect unionized workers' compensation and give the employer expanded leverage at the bargaining table. It follows that a union has a legitimate interest in protecting the working conditions of its members by using its economic weapons to discourage the employer from double breasting.

## II.

### *Separate Employers*

Under section 8(b)(4)(ii)(B), the secondary boycott section that the majority believes is applicable here, a union's action can be viewed as a secondary boycott only if the union's object is to "forc[e] or requir[e] *any other employer* to recognize or bargain with a labor organization as the representative of his employees." 29 U.S.C. § 158(b)(4)(ii)(B) (1988) (emphasis added). In holding that Harper and Limbach, which together constitute a double breasted operation, can be treated as separate employers for purposes of this secondary boycott provision, the majority mechanically applies the factors that courts have used in other contexts to distinguish between separate employers and a single business enterprise. However, in the only two such Third Circuit cases cited by the majority, *Al Bryant, Inc.,* 711 F.2d 543, and *Eichleay Corp. v. International Ass'n of Bridge Workers,* 944 F.2d 1047 (3d Cir.1991), we reviewed findings by the Board in the former case and the arbitrators in the latter that the double breasted companies were a single employer. Thus, on appeal, we were not faced with the question of the circumstances, if any, in which they could be viewed as separate employers for labor relations purposes.

There was no suggestion in either of those cases, or by any court cited by the majority, that a test used to determine whether a double breasted operation should be required to bargain was equally applicable to a union for the purpose of the secondary boycott provision, with its threat of large damage verdicts. It is significant that the single employer doctrine was originally adopted by the National Labor Relations Board as a basis for determining whether to aggregate the business volume

of related concerns in order to meet the minimum dollar volume of business requirement imposed by the Board itself as a jurisdictional threshold. *See* 21 NLRB Ann.Rep. 14–15 (1956). The Board's use of four criteria (interrelation of operations, common management, centralized control of labor relations and common ownership) as determinative of whether nominally separate business entities are an integrated enterprise, and hence a single employer for the applicable jurisdictional standards, was approvingly referred to in *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam).

The same single employer criteria were thereafter applied in certain other contexts, such as determining whether a wholly-owned subsidiary was obligated to follow a labor agreement entered into by its sister company, *see South Prairie Constr. Co. v. Local 627, International Union of Operating Eng'rs*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam), or whether a nominally separate business entity, which is a component of a single corporate enterprise, had a duty to bargain with the union, *see United Tel. Workers v. NLRB*, 571 F.2d 665 (D.C.Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). Consistent with this line of authority, we applied the traditional single employer test in *Al Bryant, Inc.* and *Eichleay Corp.* to determine the bargaining obligations of an employer who maintained double breasted operations.

The four-part formula used to determine the existence of a single employer in these contexts reflects the underlying purpose of the single employer doctrine, which is to treat a functionally integrated company as one employer for labor relations purposes despite the technical corporate separateness of its constituent entities. The single employer doctrine addresses the concern that an employer may be attempting to avoid the responsibilities of a labor contract or a labor-management relationship through corporate structure. *See, e.g., Penntech Papers, Inc. v. NLRB*, 706 F.2d 18 (1st Cir.), *cert. denied*, 464 U.S. 892, 104

S.Ct. 237, 78 L.Ed.2d 228 (1983); *Local No. 627, International Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040 (D.C.Cir. 1975), *modified sub nom. South Prairie Constr. Co. v. Local No. 627, International Union of Operating Eng'rs*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); *Gerace Constr., Inc.*, 193 N.L.R.B. 645 (1971).

The four factors generally considered to be determinative of a single employer make sense when they are applied in the bargaining obligation context. In this case, as the majority notes, the jury's determination of the separate employer issue was focused on whether there was centralized control over the labor relations of the two companies. In the ordinary case in which the doctrines variously referred to as "alter ego," "successorship," or "single employer" are invoked, the centralized control of labor relations is patently related to the ultimate issue of the bargaining obligation of the employer. In the double breasted operation, however, it would not be unusual to find decentralized control of labor relations, and thus that factor should have no bearing on the treatment of such operations for purposes of secondary boycotts.

The inquiry for purposes of determining whether there were separate employers for purposes of the secondary boycott issue is an entirely different one. Congress condemned secondary boycotts because it believed that they "unfairly ... enmesh in a proliferating dispute a person who [is] in truth a 'neutral,' a 'stranger' to that dispute who was 'uninvolved' in the union's grievance against the primary employer." *See* R. Gorman, Labor Law 241 (1976); *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 627, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (broad policy objective of section 8(b)(4) is "the protection of neutrals against secondary pressure"); *NLRB v. Local 810, Steel, Metals, Alloys & Hardware Fabricators*, 460 F.2d 1, 5 (2d Cir.) (same), *cert. denied*, 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972). The statutory language distinguishes between primary activity, which is protected, and secondary activity, which is not. *See* proviso to

§ 8(b)(4)(B) (nothing in the section "shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing").

The legislative history of section 8(b)(4) "securely indicates" that Congress intended the section to prevent only pressure against neutral employers. *Production Workers Union v. NLRB*, 793 F.2d 323, 328 (D.C.Cir.1986). The Conference Report accompanying the Taft–Hartley Act lists as examples of prohibited conduct only classic secondary boycotts—pressure directed against a truly neutral party. H.R.Rep. No. 510, 80th Cong., 1st Sess. 43 (1947), *reprinted in* I Legislative History of the Labor Management Relations Act, 1947, at 546–547, U.S.Code Cong.Serv. 1947, p. 1135. The comments on the floor of the Senate by Senator Robert Taft, a co-sponsor of the Act, further clarify Congressional intent. The senator explained:

> This provision makes it unlawful to resort to a secondary boycott to injure the business of a *third person* who is *wholly unconcerned* in the disagreement between an employer and his employees.... [U]nder the common law, a secondary boycott was unlawful.... [But] under the provisions of the Norris–Laguardia Act, it became impossible to stop a secondary boycott or any other kind of strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts.

93 Cong.Rec. 4198 (1947), *reprinted in* II Legislative History of the Labor Management Relations Act, 1947, at 1106 (emphasis added).

This unequivocal legislative history makes clear that union action is secondary, and therefore proscribed by the Act, only if it fits within the common law definition of secondary boycotts. *See Production Workers Union*, 793 F.2d at 329. The classic definition, often relied upon by the Supreme Court in connection with Section 8(b)(4), was written by Judge Learned Hand: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." *International Brotherhood of Electrical Workers v. NLRB*, 181 F.2d 34, 37 (2d Cir.1950), *aff'd*, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); *see Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 388, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); *Local 761, International Union of Electrical, Radio & Machine Workers v. NLRB*, 366 U.S. 667, 672, 81 S.Ct. 1285, 1288, 6 L.Ed.2d 592 (1961). The central inquiry is whether "pressure [is] tactically directed toward a neutral employer in a labor dispute not his own." *National Woodwork*, 386 U.S. at 623, 87 S.Ct. at 1257.

Because the issue of neutrality is central to the secondary boycott inquiry, I believe that the traditional single employer test cannot be applied to a double breasted operation in this context. As the NLRB itself has recognized, "the question of neutrality 'cannot be answered by the application of a set of verbal formulae.'" *Teamsters, Local Union No. 560*, 248 N.L.R.B. 1212, 1214 (1980) (*quoting Vulcan Materials Co. v. United Steelworkers*, 430 F.2d 446, 451 (5th Cir.1970), *cert. denied*, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971)).

A court must make a common sense determination based on the totality of the circumstances in determining whether the firm against which economic pressure is applied is a "neutral" to the dispute. *See Local 810, Steel, Metals, Alloys & Hardware Fabricators*, 460 F.2d at 6. Viewed realistically, the unionized portion of a double breasted operation is not a "neutral" bystander nor is it a "stranger" to a dispute concerning unionization of its non-union counterpart. The *raison d'être* of establishment of a double breasted operation is the effort of the employer to be free from union constraints in a portion of its operation. In contrast to the traditional secondary boycott where a union seeks to coerce a secondary employer merely because the secondary does business with an offending employer over which it has no control, *see, e.g., NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 71

S.Ct. 943, 95 L.Ed. 1284 (1951); *NLRB v. Milk Drivers & Dairy Employees Local Union No. 584*, 341 F.2d 29 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed.2d 64 (1965); *Chauffers, Teamsters & Helpers Local Union No. 175 v. NLRB*, 294 F.2d 261 (D.C.Cir.1961) (per curiam), this is an intra-family affair.

It is undisputed and, indeed, the majority concedes that Limbach restructured its corporate form and created Jovis Constructors, Inc. so that it could acquire nonunion contractors. Prior to 1982, Limbach, Inc. competed in the construction industry in a totally unionized fashion with the benefit of section 8(f) agreements with various local unions. Had Limbach merely desired to expand its operations to Florida, it could have opened a branch office there similar to those it maintains in Boston, Pittsburgh, Columbus, Detroit, and Los Angeles. Instead, it had Jovis acquire Harper precisely because Harper was nonunion.

Once Harper was purchased, the unions directed their attention to securing recognition of the union. When Edward Carlough, the General President of the International Union, wrote to Walter Limbach in August 1983, stating that the union believed that Limbach would also enter into a labor agreement for the newly-acquired Florida entity, he was merely assuming that history would repeat itself inasmuch as Limbach had previously granted voluntary union recognition pursuant to section 8(f) for each of its divisions operating in other cities. When Limbach declined, asserting Harper's separateness and the absence of any authority or responsibility by Limbach Company for Harper's labor relations policies, the local unions filed grievances in the summer of 1984, pursuant to the existing labor agreements with Limbach.

Further efforts by the unions to have the existing labor agreements interpreted as applicable to Harper were stymied because the National Joint Adjustment Board (NJAB), a body composed of equal union and employer representation, deadlocked over the grievances. Only then did the unions, through their decision to disclaim representation of Limbach employees at the end of the existing section 8(f) agreements, seek to exert economic pressure on Limbach to cease proceeding as both a unionized and nonunionized operation.

The unions' dispute with Limbach is exclusively over Limbach's decision to operate in a double breasted manner. Insofar as the unions' economic pressure was directed at the entity that made this decision, and the unions reasonably believed that this decision would have a negative impact on the terms and conditions of employment for the employees the unions represented, Limbach is hardly a neutral "secondary employer" in this labor dispute.

This is a far cry from the situation where a union, seeking to force recognition from the primary employer, pickets the employer's customers or suppliers, businesses that have no stake in the labor dispute. As Justice Brennan recognized in *National Woodwork*, "[t]he central theme pervading [the] provisions of protection for the neutral employer confirms the assurances of those sponsoring the section that in [what is now section 8(b)(4)(B) ] Congress likewise meant to protect the employer only from union pressures designed to involve him in disputes not his own." 386 U.S. at 625–26, 87 S.Ct. at 1258. He explained that notwithstanding the "broad language" of the provision that is now section 8(b)(4)(B) of the Act, judicial decisions have uniformly limited its application to "secondary situations," and have refused to read it "to ban traditional primary strikes and picketing having an impact on neutral employers even though the activity fell within its sweeping terms." *Id.* at 626–27, 87 S.Ct. at 1259. Justice Brennan continued, "however severe the impact of primary activity on neutral employers, it was not thereby transformed into activity with a secondary objective." *Id.* at 627, 87 S.Ct. at 1259.

The inapplicability of the secondary boycott provisions when the target is not truly neutral is illustrated by the " 'ally doctrine' cases, in which the union's pressure was aimed toward employers performing the work of the primary employer's striking employees." *Id.* at 627, 87 S.Ct. at 1259. Despite the literal terms of the secondary

boycott provision, it was not applied in the "ally doctrine" cases because "the union was not extending its activity to a front remote from the immediate dispute but to one intimately and indeed inextricably united to it." *Douds v. Metropolitan Federation of Architects,* 75 F.Supp. 672, 677 (S.D.N.Y.1948), *quoted approvingly in National Woodwork,* 386 U.S. at 627, 87 S.Ct. at 1259.

Viewed in the light of the legislative history and the Court's decisions limiting the application of secondary boycott provisions to those cases where a truly neutral employer is involved, it is apparent that Limbach does not fit into the concept of a true neutral. It is hardly "remote" from the instant dispute. Instead, Limbach and Harper operate together as part of a single coherent business strategy designed to take advantage of both the unionized and nonunionized segments of the market for construction.

As the majority recognizes, the separate boards of directors of Limbach and Jovis were non-operational "except to fulfill legal requirements, and the presidents of both companies reported directly to Walter Limbach." (949 F.2d at 1260). Walter Limbach remained at the apex of Limbach Constructors Inc. after the reorganization. I find it surprising that the majority fails to acknowledge that Walter Limbach testified at trial that "central management and ... business executive management" were located in Limbach Constructors Inc., which was the parent of Limbach Co. and Harper. *See* App. at 1105–06. Limbach Co. sent its own management personnel to Harper to serve as the executive management of Harper. Furthermore, John Fern, one of Limbach's Vice Presidents, was sent to Jovis to serve as its President and was given official labor relations responsibilities for Jovis. Notwithstanding the technical separation, there was extensive integration of Limbach Constructors Inc.'s operations. Limbach and Harper utilized the same accounting and payroll services, personnel services, legal assistance, market research, advertising and sales services, mechanical engineering services, estimating services, and administrative services including procurement and assignment of automobiles, janitorial records and maintenance of company records.

Even if the two halves of the double breasted operation had decentralized labor relations, this could not serve to mask the interest of each in maintaining the status quo as a double breasted operation. Therefore, neither could be viewed as a neutral with respect to disputes concerning the unionization of the other.

Neither the decision in *Gottfried v. Sheet Metal Workers' Local No. 80,* 876 F.2d 1245, 1247 (6th Cir.1989), nor the Board's decision in *Local Union No. 80,* 305 N.L.R.B. No. 36 (Sept. 30, 1991), provides any persuasive reason why the halves of the double breasted operation should be viewed as neutral separate employers for secondary boycott purposes. In *Gottfried,* the court merely decided that the argument that they were separate employers was not frivolous, the standard by which the Regional Director's petition for injunctive relief should be judged. As for the Board's decision in *Local Union No. 80,* while we ordinarily owe the Board deference in its legal analysis of the NLRA, in this case its decision does not represent the kind of reasoned policy analysis and expertise which are the basis for deference. Because that decision considered the single employer issue only in cursory fashion and did not specifically hold that the traditional single employer test should strictly apply in cases like the present one, we need not defer to the Board on this issue. Nothing in the opinion gives rise to a rule on this issue to which we owe deference. In any event, we need only defer to Board interpretations of the NLRA that are "rational and consistent with the Act." *See Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 2235, 96 L.Ed.2d 22 (1987). In light of the clear Congressional intent to proscribe as a secondary boycott only union conduct directed against employers that are truly neutral to the labor dispute, I believe that the Board's mechanical application of the four factor single employer test in this context is clear-

ly inconsistent with the intent of the NLRA.

In summary, the decision of the majority that Harper and Limbach, two halves of a double breasted operation, are separate employers for purposes of the secondary boycott provision of the NLRA represents an unwarranted extension of the secondary boycott provisions to what is essentially a family dispute. I believe that such an extension deviates from the policy enunciated by the Supreme Court to limit the secondary boycott provisions to those cases where the activity is truly secondary. Here, as a matter of law, it is clearly not.

### III.

### Disclaimer as Coercion

There is another, and independent, reason to reverse the decision of the district court. The secondary boycott provision of section 8(b)(4)(ii) covers only union conduct that acts "to threaten, coerce or restrain" for certain prohibited objectives. It is implausible to view a union's disclaimer of interest in negotiating a new section 8(f) contract as a threat, coercion, or restraint.

As the Supreme Court has repeatedly stated, the statutory words "threaten, coerce or restrain" are " 'nonspecific, indeed vague,' " and should therefore be interpreted "with caution" and not be given a " 'broad sweep.' " *Edward J. DeBartolo Corp. v. Florida Gulf Coast Trades Council,* 485 U.S. 568, 578, 108 S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988) (*quoting NLRB v. Drivers Local Union No. 639,* 362 U.S. 274, 290, 80 S.Ct. 706, 715, 4 L.Ed.2d 710 (1960)). Accordingly, the Supreme Court has excluded from the definition of coercion certain union activities that are fundamentally peaceful in nature and are dissimilar from secondary striking and picketing, which the legislative history indicates were the activities that the secondary boycott provision was intended to proscribe. *Id.* 485 U.S. at 574, 108 S.Ct. at 1397; S.Rep. No. 187 on S. 1555/86th Cong., 1st Sess. 70 (1959), *reprinted in* 1 Legislative History

of the Labor–Management Reporting and Disclosure Act of 1959, at 475 (1959), 1959 U.S.Code Cong. & Admin.News, 2318, 2383.

Thus, in *DeBartolo,* the Supreme Court held that the handbilling of customers of a secondary employer was not "coercion" within the meaning of section 8(b)(4) because "[t]here was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall." *Id.* at 578, 108 S.Ct. at 1399. The Court explained that the mere fact that the union's activity had "some economic impact on the neutral" was insufficient to support a finding of "coercion." *Id.* at 579, 108 S.Ct. at 1399. Similarly, in *NLRB v. Fruit Packers,* 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964), the Supreme Court held that consumer picketing at a secondary establishment aimed solely at persuading customers not to purchase a specific product was not "coercion." Because a disclaimer is merely a refusal to negotiate, this case is distinguishable from *Sheet Metal Workers Local Union No. 91 v. NLRB,* 905 F.2d 417 (D.C.Cir.1990), cited by the majority, where a union refused to follow the terms of an existing section 8(f) agreement unless the employer agreed to an illegal "hot cargo" clause.

It is significant that in this case, the disclaimer occurred at the conclusion of a section 8(f) agreement. Congress recognized that the mobility of the construction industry's work force and the highly cyclical nature of construction work made the "majority representative" model of unionization present in other industries impracticable in the construction industry. *See International Ass'n of Bridge Workers v. NLRB,* 843 F.2d 770, 772–73 (3d Cir.), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988). As a result, in 1959, Congress added section 8(f) to the NLRA, which legalized pre-hire agreements [1] entered into between unions and employers in the construction industry.

---

**1.** A pre-hire agreement is defined as a contract that is entered into between an employer and a union before the employees to be covered under

the contract have been hired. *See Robert's Dictionary of Industrial Relations* 562 (3d ed.1986).

In contrast to labor agreements entered into pursuant to section 9(a), under which the majority status of the union is irrebuttably presumed to continue for a reasonable period of time, *see Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *Toltec Metals, Inc v. NLRB*, 490 F.2d 1122 (3d Cir.1974), thereby imposing on the employer a continuing duty to bargain in good faith with the representative chosen or designated by his employees, the same obligation does not apply when a section 8(f) agreement terminates. When a work force is unionized pursuant to a § 8(f) agreement, no "irrebuttable presumption" of union majority attaches. Therefore, the Board has held that when a section 8(f) agreement expires, the employer may freely terminate the bargaining relationship, even if its reason for refusing to bargain with the union is to deprive its employees of the benefits of union representation. *See Yellowstone Plumbing, Inc.*, 286 N.L.R.B. 993, 994 (1987).

In *International Ass'n of Bridge Workers*, we upheld the Board's interpretation in *John Deklewa & Sons*, 282 N.L.R.B. 1375 (1987), that "§ 8(f) pre-hire agreements [are] only enforceable during the term of the agreement and [can] not be converted into traditional collective bargaining agreements with lingering rights and obligations absent an election and certification." 843 F.2d at 775.

Because bargaining relationships are bilateral, not unilateral, and similar rules must and usually do govern both parties to the relationship, it would be anomalous to permit employers to walk away from their section 8(f) agreements when they expire but not give unions the same right. The majority purports to apply an evenhanded approach, and states that *"both the union and the employer are free to repudiate the agreement."* 949 F.2d at 1254 (emphasis added). However, the result of its interpretation is far from evenhanded, because it holds that a union cannot decline to bargain for a new section 8(f) agreement if its objective is unionizing the second half of a double breasted operation. The Board's similar holding in *Local Union No. 80* is no more persuasive than is the majority's, par-

ticularly in light of the Board's earlier holding that an employer has no duty to bargain after the expiration of a section 8(f) agreement, even if the employer was motivated by antiunion animus and unlawfully encouraged decertification of the union. *See Yellowstone*, 286 N.L.R.B. at 993–994.

Furthermore, the Board's opinion in *Local Union No. 80* is internally inconsistent. While holding that the disclaimer of a section 8(f) bargaining relationship was an illegal secondary boycott, the Board nevertheless refused to order the union to bargain on the ground that the union had no further bargaining obligation upon the expiration of the section 8(f) agreement. The Board reasoned:

[T]o issue an affirmative bargaining order would violate the principle laid down in [*John Deklewa & Sons*, 282 NLRB 1375, *enf. sub. nom. Intern. Ass'n. Bridge, etc., Local 3 v. NLRB*, 843 F.2d 770 (3rd Cir.1988), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988) ] that an 8(f) union has no further bargaining obligation after the expiration of the contract; while requiring the [union] to implement contractual terms they have not agreed to ... is a remedy precluded by the Supreme Court's holding in *H.K. Porter v. NLRB*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970).

*Local Union No. 80*, Slip Op. at 13. It simply defies common sense to hold that a union has no obligation to bargain for a new section 8(f) agreement and yet hold that its disclaimer of interest in doing so can violate the statute.

Furthermore, if the unions had no duty to bargain for a new section 8(f) agreement, as the Board's opinion clearly states, the jury could not have reasonably found damages as a result of the breach of that duty. The Board's opinion makes clear the error of the district court in failing to instruct the jury, as requested by the unions, that "in the construction industry ... at the expiration of the agreement, neither the employer nor the union is obligated to enter into a successor agreement." App. at 3437–3438. Thus I believe that the dam-

age verdict in this case is inconsistent with the established legal principle, reaffirmed by the Board in *Local Union No. 80*, that there is no legal requirement that a construction industry union enter into a successor section 8(f) collective bargaining agreement once the prior section 8(f) contract has expired.

## IV.

The draconian effect of the majority's holding cannot be underestimated. Unlike the situation of the usual unfair labor practice, where the remedy is an order of the Board requiring bargaining, a finding of a secondary boycott leaves the union open to extensive damages, as were awarded in this case. If upheld, this will leave unions defenseless in their efforts to combat the increasing use of double breasted operations while employers will be free to enter into such arrangements without any comparable deterrence.

The general approach of Congress in the labor relations area has been to allow each party to use economic and bargaining strategies to exert pressure upon the other. *See* Senate Committee on Education & Labor, S.Rep. No. 573, 74th Cong., 1st Sess. 2 (1935) ("[d]isputes about wages, hours of work, and other working conditions should continue to be resolved by the play of competitive forces"). By applying the secondary boycott provision to what is essentially an economic struggle between an employer and its employees, the majority has deprived the unions of their traditional weapons and thereby shifted, perhaps irreparably, the balance between the parties in the construction industry.

For the foregoing reasons, I would reverse the order of the district court denying the unions' motion for judgment notwithstanding the verdict on the issue of secondary boycott liability.

1. Because I believe that Limbach may not have been a neutral employer within the meaning of the secondary boycott provisions of the NLRA and that the union's actions against Limbach constituted action against a primary employer, I find it unnecessary to determine whether the

BECKER, Circuit Judge, dissenting.

I agree with the overarching point made by Chief Judge Sloviter in Part II of her dissent and with much of the analysis contained therein.[1] As the Chief Judge persuasively demonstrates, application of the traditional single employer doctrine proves inapposite in the secondary boycott context.

What troubles me about the Chief Judge's analysis, however, is that it completely supplants the single employer test in the secondary boycott setting with a general rule, and one that unsuccessfully attempts to cover all situations. I believe that we need not completely abandon all aspects of that well-established test when deciding the single employer issue. I write separately to outline the contours of a revised test that would, consistent with the Chief Judge's position, retain most elements of the single employer doctrine. Such a test would be useful to judges when applying the doctrine and charging jurors if the Supreme Court grants certiorari in this case, as it might well do considering the importance of the issue, and reverses the judgment of this court (and the district court).

The single employer test sets out four criteria for determining whether two corporate entities are a single employer: 1) interrelationship of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership. *See NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 553 (3d Cir.1983). The test's critical flaw in this context arises primarily from its emphasis on the centralization of labor relations. The majority makes much of the fact that each subsidiary was responsible for its own labor relations. The jury undoubtedly reasoned from the instruction, which was given consistently with this standard, that labor relations were decentralized and that, under the law, Harper

union's disclaimer of its pre-hire agreement with Limbach was an unfair labor practice. Hence, I join neither the majority opinion nor Part III of Chief Judge Sloviter's opinion with respect to that issue. I do, however, join in Part IV of Chief Judge Sloviter's opinion.

and Limbach were therefore separate employers.

Given that decentralization of labor relations does not necessarily evidence separate employer status, Chief Judge Sloviter concludes that the entire single employer test should be abandoned in the secondary boycott context. Hence, she advocates a "common sense determination based on the totality of the circumstances" as to whether a firm is a "neutral" in a dispute. See Dissent of Chief Judge Sloviter at 1237. I believe that we should not abandon the test so completely. Instead, I believe that the appropriate standard for determining single employer status in this context should depend on a modification of the single employer test. Two prongs of the test should remain unchanged from the traditional test. Both common ownership and common management are relevant factors to consider in the secondary boycott context. They evidence a commonality of interests between the two entities that is critical to the determination of single employer status. They also serve to bolster the overall purpose of the single employer test, which is to determine whether there genuinely is an "arm's length relationship found among unintegrated companies." *Local No. 627, Int'l Union of Operating Engineers v. NLRB*, 518 F.2d 1040, 1045–46 (D.C.Cir. 1975), aff'd as *South Prairie Construction Co. v. Local No. 627, Int'l Union of Operating Engineers*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam).

The third prong of the single employer test, interrelation of operations, requires modification when applied to the secondary boycott context. Traditionally, courts have focussed on whether the entities have operated in a manner befitting one corporate entity. Thus, day-to-day operations of the entities may be an important part of the inquiry. In the double-breasted situation, however, corporations might not mesh their operations as closely as they do in other contexts in order to serve the larger corporate function of maintaining both a union and a non-union operation. Nonetheless, the double-breasting structure may in fact, in and of itself, demonstrate how closely the corporation is interrelated. The very act of keeping some operations separate often evidences a deeper intent to serve the corporate purpose of bifurcating to preserve partially union and partially non-union workforces. Hence, in the secondary boycott context, the interrelationship of operations prong should emphasize whether there is substantial overlap between the *kind* of work performed by the primary and secondary employer and whether the structure of operations appears designed to serve a single corporate interest.

The fourth and final prong of the single employer test, the centralization prong, should be completely altered when applied to the secondary boycott context. The purpose of the single employer test is to determine identity of interest between two entities, and centralization generally evidences such identity. Nothing dictates that decentralization always demonstrates the absence of identical interests, however. Indeed, where decentralization makes it possible for an employer to avoid labor responsibilities under other portions of the Act, such decentralization may well suggest identity of purpose and, hence, single employer status. When the issue is whether a union has engaged in a secondary boycott and the union defends by saying that the two entities are a single employer, this prong of the test should focus on the overall structure of labor relations. The consideration must be whether the structure of labor relations is designed so that one single employer may have both non-union and union workers to benefit the employer or whether there are genuinely two employers whose labor relations have been designed absent consideration of how to benefit each other.

I believe that this modification of the single employer test would more adequately serve the purposes of the test in the secondary boycott context and would give judges a standard by which to determine whether two entities are in fact a single employer.

Moreover, there may be situations where two corporate entities are not part of a single employer but the secondary employer is nonetheless not "neutral" within the

meaning of section 8(b)(4) of the National Labor Relations Act. In other words, although the employers prove separate status under the single employer test, that may not, as the majority suggests, end the inquiry. Certainly, all union activity directed at secondary employers does not constitute a secondary boycott. Courts may still be obligated to go beyond the single employer test to determine neutrality. In some situations, courts do not consider activity aimed at a "secondary" employer to be aimed at a "neutral" employer. The ally doctrine, as the Chief Judge explains, provides one example. See, for example, *NLRB v. Business Mach. Local 459, IUE,* 228 F.2d 553 (2d Cir.1955). Hence, in addition to modifying the single employer test as I have suggested, courts should consider that there is the possibility of non-neutrality if there is a finding of a sufficiently strong relationship between the entities to destroy neutrality. See *Teamsters Local 560 (Curtin Matheson Scientific, Inc.),* 248 NLRB 1212 (1980).

For the reasons set forth in the opinion of Chief Judge Sloviter, as supplemented herein, I respectfully dissent.